

1 | J. H. McQuiston, pro se
McQuiston Associates
2 | 6212 Yucca St, Los Angeles, CA 90028-3223
Telephone 323-464-6792

3

4

5

6

7

8 UNITED STATES DISTRICT COURT

9 CENTRAL DISTRICT OF CALIFORNIA

10 | J. H. McQUISTON,

11 |     Plaintiff,

        v.

12 |

CITY OF LOS ANGELES;

13 | ANTONIO VILLARAIGOSA, Mayor;

MARGARET C. FIELDS, Property Owner;

14 | SHAUN BUTLER, Property Lessee;

RENEE WEITZER, City Employee;

15 | LINN K. WYATT, City Employee;

ED P. REYES, City Councilmember;

16 | PAUL KREKORIAN, City Councilmember;

17 |     Defendants.

**CV11-05149-DSF(MRW)**

CASE NO.

COMPLAINT FOR INJUNCTIVE and
DECLARATORY RELIEF AND FOR
DAMAGES

18

19 | Plaintiff, J. H. MCQUISTON, alleges as follows:

20 | JURISDICTION, PARTIES, AND VENUE

21 |     1. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

22 |     2. This action arises under 42 U.S.C. § 1983, the Civil Rights Act of

23 | 1871, 18 U.S.C. § 1346 , scheme or artifice to defraud, and Amendments V and XIV

24 | § 1, United States Constitution.

25 |     3. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391.

26 |     4. There is now existing between the parties an actual and justiciable

27 | controversy in an amount exceeding $10,000 in respect to which Plaintiff

28 | requires injunctive relief as well as a decision of his rights by this Court.

-1-

1    5. Plaintiff, J. H. McQUISTON (hereinafter "Plaintiff" or "McQ" is

2  an individual owning Restricted Industrial Property at 1035 N. Orange Drive, Los

3  Angeles, California 90038.

4    6. Defendant MARGARET C. FIELDS (hereinafter "Fields")is an individual

5  owning Restricted Industrial Property at 1037 N. Sycamore Avenue, Los Angeles,

6  California 90038.

7    7. Defendant SHAUN BUTLER (hereinafter "Butler") is an individual leasing

8  the Fields property at 1037 N. Sycamore Avenue, Los Angeles, California 90038.

9    8. Defendant ANTONIO VILLARAIGOSA (hereinafter "Mayor") is the elected

10  Mayor of Los Angeles, who under City Charter § 215 took an oath as follows:
        "I do solemnly swear (or affirm, as the case may be) that I will support
11       the Constitution of the United States and the Constitution of the State of
         California and the Charter of the City of Los Angeles, and that I will
12       faithfully discharge the duties of the office of Mayor to the bestof my
         ability."

13

14    9. Defendant ED P. REYES (hereinafter "Reyes") is the elected

15  Councilmember for Council District 1 and the Chairman of the City Council's

16  Planning and Land Use Management Committee, who under City Charter § 215 took

17  an oath as follows:
        "I do solemnly swear (or affirm, as the case may be) that I will support
18       the Constitution of the United States and the Constitution of the State of
         California and the Charter of the City of Los Angeles, and that I will
19       faithfully discharge the duties of the office of Councilmember to the best
         of my ability."

20

21    10. Defendant PAUL KREKORIAN (hereinafter "Krek") is the elected

22  Councilmember for Council District 2 and a Member of the City Council's Planning

23  and Land Use Management Committee, who under City Charter § 215 took an oath as

24  follows:
        "I do solemnly swear (or affirm, as the case may be) that I will support
25       the Constitution of the United States and the Constitution of the State of
         California and the Charter of the City of Los Angeles, and that I will
26       faithfully discharge the duties of the office of Councilmember to the best
         of my ability."

27

28    11. Defendant RENEE WEITZER (hereinafter "WEITZER") is employed by the City

1   as a Staff Member of Council District 4.

2       12. Defendant    LINN K. WYATT(hereinafter "WYATT") is employed by the

3   City as a Staff Member of the City Planning Department.

4       13. Defendants CITY, FIELDS AND BUTLER are sued for compensation for

5   injuring and continuing to injure McQ's property at 1035 N Orange Drive.

6       14. Defendants MAYOR, REYES, KREKORIAN, WEITZER, and WYATT are sued in

7   personal capacity for acting wilfully to defraud McQ and the City, or to cause

8   McQ great loss of property rights and equal protection of law afforded McQ by

9   the United States Constitution.

10       15. The injunctive and declaratory relief requested herein is also intended

11   to terminate the continuous pattern of granting unconstitutional "special

12   privileges" upon favored landowners by City officials, and to continue Judicial

13   oversight until the pattern is demonstratively ended.

14   Factual Allegations

15       16. Plaintiff admits that City may zone itself according to a reasonable

16   Plan, per its police power. Plaintiff believes City thereafter may depart from

17   what it determined was "reasonable and proper zoning" only if City's both

18   original and amended zoning or variance are justified yet none invalidates the

19   reasoning City set forth for all others.

20       17. Properties at 1037 N. Sycamore Avenue and 1036 North Orange Drive are

21   situated in City Council District 4. Sycamore is situated North-South, one

22   street East of LaBrea Avenue. Orange is situated North-South, two streets East

23   of LaBrea Avenue. An alley links Sycamore and Orange, one parcel North of the

24   two properties. The zoning map is set forth in Exhibit A of this Complaint.

25       18. Assessor's Record shows the last ownership change for 1037 N. Sycamore

26   was in 1994, about 5 months after ZA 92-1196-ZV was decided. The presumption is

27   DEFENDANT FIELDS owned the property since July 14, 1994.

28       19. The City General Plan now consists of a "Framework" and over 30 Area

1  Plans. The Hollywood Area Plan contains myriad subareas, each zoned for specific
2  uses and prohibitions and exceptions. The subarea at issue is but a small
3  percentage of the Hollywood Area Plan.

4      20. Southern California Association of Governments reported commercially-
5  zoned property in Los Angeles is worth eight (8) times the worth of
6  industrially-zoned property. "Use-flippers" buy industrial property, "flip" it
7  to commercial use, and sell at an enormous profit. But SCAG said industrial
8  property, per unit of area, attracts more and higher-paying jobs and demands
9  less city services than commercial property; a city is injured if industrial use
10 "flips" to commercial use.

11     21. City Planning declared Hollywood's welfare and economic security
12 depends on a strong Industrial sector. Industrial property being reduced by
13 "flips" to commercial and other uses, in 1976 the City prohibited further
14 "flips" by creating the Restricted Industrial zone (designated "MR-1")applied
15 to McQ's property and others surrounding it.

16     22. The Purpose for highly-exclusionary restrictions (**87% of value lost**)is
17 set forth in City Zoning Code at 12.17.5 A:
    "1. To protect industrial land for industrial use, and **prohibit**
18 **unrelated commercial** and other non-industrial uses.
    2. To provide a reasonable range of interim uses in this zone, so that
19 land owners may receive income from temporary use, while the industrial
land reserve is being protected for future growth.
20     3. To upgrade industrial development standards;
        (a) so that industry will be a better neighbor to residences.
21         (b) **to protect industrial investment against incompatible**
**residential, commercial and industrial uses,** and
22         (C) to prevent future industrial blight.
    4.To **preserve industrial land** for light industrial uses and to provide for
23 non-retail businesses which **enhance the City's employment** base.
    5.To reflect and accommodate the shift in industrial land use from
24 traditional industrial activity to uses such as those involving record
management, research and development, information processing, electronic
25 technology, and medical research." (Emphasis added)

26     23. Not all Industrial property in Hollywood is protected from "flipping",
27 and some City personnel promote conversions.

28     24. City Planning Department and Community Redevelopment Agency recently

1  warned that with only a 2 percent industrial vacancy-factor but with
2  considerable commercial vacancies Hollywood is in jeopardy.

3      25. In 1973 McQ constructed a factory on his property, 1035 North Orange
4  Drive, when it was zoned M-2, Light Industrial.

5      26. The City prohibited McQ's factory unless there was **clear and**
6  **unobstructed passage** ("exit ways") surrounding the building and extending
7  straight to the street (i.e, no wall or gate across the pathways). McQ
8  fruitlessly protested the lack of security, but exigency forced acquiescence.
9  **McQ relied on the City for protection, and for about 18 years McQ's property**
10 **suffered no incidents nor destruction.**

11     27. On or about 1991 McQ's Orange property commenced being attacked with
12 feces, urine, condoms, hypodermic syringes, and other objects related to sexual
13 acts, on the grounds and on the walls. In 2010 **their cause was proved to be**
14 **associated with 1037-Sycamore's use for sexual-encounters.**

15     28. City Zoning Code § 12.17.5 prohibits by omission a "sexual
16 encounter establishment" in a MR-1 Restricted Industrial Zone.

17     29. City Zoning Code § 12.24 W 18 prohibits a permit for "conditional use"
18 except in specified zones not including MR-1, and **prohibits conditional use**
19 **within 500 feet of certain zones.** City Zoning Codes §§ 12.27 A & D **prohibit**
20 granting use-variance: (emphasis added)
                "to grant a special privilege or to permit a **use substantially inconsistent**
21              **with the limitations upon other properties** in the same zone and vicinity".

22     30. In 1992 **City Inspectors and Police** raided 1037 Sycamore on **three**
23 separate occasions, ordering its **unlawful use for sexual-encounters to cease** and
24 to **vacate the building because it was structurally-modified without permits or**
25 **safety inspection.**

26     31. "Peter de Placido" the alleged sexual-encounter operator and sub-lessee
27 **did not vacate,** but 2 years later he applied for a **variance** to operate "legally"
28 the "sexual encounter establishment".

32. City Zoning Code 12.70 C, "Prohibition", says in part:
   "[After May 18, 1986]**no person shall cause or permit** the establishment, or substantial enlargement of an adult entertainment business within 500 feet of **any lot in an "A" or "R" zone, or within the "CR", "C1", or "C1.5"** zones in the City of Los Angeles." (Emphasis added)

33. City Zoning Code 12.22 A20(a), permitting establishment or continuance of an "adult entertainment business" is inapplicable because it:
   "shall not apply to * * * sexual encounter establishments."

34. Amendment XIV § 1, United States Constitution, prohibits a "special benefit" to be given to anyone by the City. It "chains" to the City by imposition of § 65906, California Government Code, which sets forth:
   "Variances from the terms of the zoning ordinances shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance **deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.**
   "Any variance granted shall be subject to such conditions as will assure that the **adjustment thereby authorized shall not constitute a grant of special privileges** inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated.
   "A **variance shall not be granted for a parcel of property which authorizes a use or activity which is not otherwise expressly authorized by the zone regulation governing the parcel of property.**" (emphasis added)

35. Being two-edged, § 65906 requires proof not only that the land requesting variance is denied "equal protection" but that the remedy sought does not provide a "special privilege" depriving equal protection to all other properties in the zoning subarea.

36. Government Code § 65800 requires the City to obey § 65906.

37. Government Code § 65852 requires:
   "All such regulations shall be **uniform** for each class or kind of building or use of land **throughout each zone** * * *." (emphasis added)

38. Plaintiff objected in writing to the Administrator. Plaintiff's letter to the Board is set forth in Exhibit "B". The property owner came from Hawaii to object against permitting the use on her property. Property owner's letter to McQ is set forth in Exhibit "C".

1   39. The 1994 approval may be assumed to be driven by the testimony of
2   DEFENDANT WEITZER, who allegedly on behalf of Council District 4 **urged approval**
3   **despite contrary law and the property owner's vigorous objection.**

4   40. None of the Administrator's five Findings fulfilled legal proof
5   requirements of §§ 65906 and 1094.5, California Government Code, set forth in
6   prior California Supreme Court case *Topanga Assn for a Scenic Community v County*
7   *of Los Angeles,* 11 C3d 506 *(en banc* 1974).

8   41. Failure of just one of the five (of six mandatory) Findings must
9   prohibit issuing a variance. In Finding #1, Administrator "justified" Variance
10  because: (1) DePlacido ignored use-law with impunity; (2) he re-constructed the
11  premises unsafely (without the City's oversight); (3) someone in City Hall
12  mistakenly-issued him a business-license; and (4) Building & Safety said finally
13  the building was safe to occupy. *Topanga* set forth that none of the above is
14  legally-relevant for a **zoning** variation.

15  42. The above 1994 approval per Case No. ZA 92-1196(ZV) **expired in 1999**
16  ("null and void" thereafter).

17  43. Years thereafter ZA 1999-299-ZV was advertised for comment, but *only*
18  *as a parking* variance for 1037 N. Sycamore on account of insufficient parking.
19  State Government Code § 65906.5 permits a parking variance:
        "notwithstanding § 65906 * * * if both the following conditions are
20      met: (a) The variance will be [incentive and benefit] for the non-
        residential **development.** (b) The variance will **facilitate access** to the
21      nonresidential development by patrons of public transit facilities,
        particularly guideway facilities." (Emphasis added)
22

23  44. The variance pertained to Zoning Code 12.21 A 4 (Off-street automobile
24  parking requirements), which in (c)(2) requires one parking space per 100 square
25  feet for such building "altered, enlarged, converted or increased in capacity
26  by the addition of * * * floor area or seating capacity", which the Assessor's
27  Record shows happened in 2000.

28  45. The parking variance **expired in 2009 ("null and void").**

46. Ten years later **the new alleged-operator,** DEFENDANT BUTLER, applied per ZA2009-2396-ZV to permit anew variances: (1) for sexual-encounter use, and (2) for reductions in parking, at 1037 Sycamore.

47. The matter was administered by DEFENDANT WYATT. Although DEFENDANT WEITZER did not appear on Record when Wyatt took Comments, two well-known "zoning expediters" implied that DEFENDANT WEITZER wanted the variances to be approved.

48. Plaintiff not only submitted briefs to DEFENDANTS WYATT and WEITZER, with points and authorities specifically prohibiting approval and itemizing McQ's injuries, but also cautioned both regarding liability for Constitutional-torts.

49. City Charter § 562(c) requires of Findings:
"The following findings shall be made before a variance may be granted:
(1) that the strict application of the provisions of the zoning ordinance would result in practical difficulties or unnecessary hardships inconsistent with the general purposes and intent of the zoning regulations;
(2) that there are special circumstances applicable to the subject property such as size, shape, topography, location or surroundings that do not apply generally to other property in the same zone and vicinity;
(3) that the variance is necessary for the preservation and enjoyment of a substantial property right or use generally possessed by other property in the same zone and vicinity but which, because of the special circumstances and practical difficulties or unnecessary hardships, is denied to the property in question;
(4) that the granting of the variance will not be materially detrimental to the public welfare, or injurious to the property or improvements in the same zone or vicinity in which the property is located; and
(5) that the granting of the variance will not adversely affect any element of the General Plan.
"* * * A variance shall not be used to grant a special privilege or to permit a use substantially inconsistent with the limitations upon other properties in the same zone and vicinity. The Zoning Administrator may deny a variance if the conditions creating the need for the variance were self-imposed."

50. The California Supreme Court in *Broadway, Laguna Ect Assn v Board of Permit Appeals,* 66 C2d 767 (*en banc* 1967) set forth how to identify legally-relevant facts for Findings like those required in § 562(c).

51. The City, by mandamus in *Philip Anaya v City of Los Angeles et al,* BS No 099892 (Superior Ct 2006), was required to abide §§ 65906 &1094.5, and

1  *Topanga* context.

2      52. WYATT'S Report approved the variances. Wyatt based the Findings on

3  facts which *Broadway* decreed were not legally-significant, and which *content*

4  *Topanga* decreed failed to comply with § 1094.5 requirements.

5      53. Wyatt Finding #1 alleged approval owing to longevity and substantial

6  investment, but Zoning Code prohibits continuation of sexual-encounter

7  establishments in any but specified zones, and Restricted Industrial is not

8  included as one of the specified zones. *Broadway* decreed "substantial

9  investment" and "self-imposed hardship" are not legally-pertinent to *granting*

10  a variance.

11      Moreover, there was proof in the Record that the "club" was not "private"

12  as Wyatt stated, nor "compatible" by appropriating land needed for Industry. Nor

13  did *Broadway* permit Wyatt's speculation about future land development to be

14  legally-pertinent.

15      *Topanga* requires and Wyatt failed to show an "unnecessary hardship"

16  accruing to the property-owner if the variance were denied.

17      54. *Topanga* said of Finding #2 requirement:
            "It also contemplates that at best, only a small fraction of any
18          zone can qualify for a variance."

19  *Topanga* said Finding #2 requires something physically-unusual, perhaps impeding

20  access or requiring unique grading, or other major physical difficulty regarding

21  property **development**.

22      55. This property was developed long ago according to Assessor's data, and

23  was successfully-used for an Industrial purpose intended by the zoning **before**

24  surreptitious entry and conversion for sexual encounters.

25      56. Wyatt in Finding #2 "assigned" "traditional hours" for Industry and

26  alleged approval by assuming the sexual-encounter business will not be open

27  during "traditional hours". Wyatt alleged "hours of use" satisfies the "special

28  circumstances" requirement, but there was no showing that specifying operational

-9-

1  hours for property zoned Restricted Industrial is allowable. If it is, then the
2  **restriction must also apply to** the 1037 Sycamore parcel's use per § 65852 and
3  Amendment XIV.

4       57. Finding #3 requires identification of a property-right which is common
5  to all other subarea properties except the subject property. For example a Court
6  decided that if a sea-tide periodically-engulfed part of a property but not
7  adjacent, similarly-zoned properties, the fact is a legal difference per #3.

8       58. Wyatt's Finding did not show any similar condition of impairment.
9  Therein was only the allegation (proved untrue in 1993)that other properties
10  were used unlawfully, so Sycamore was entitled to do the same.

11       59. Finding #4 allows no variance to be detrimental to public welfare or
12  injury to  property or improvements in the zone. Clarifying, *Topanga* said:
            "A zoning scheme, after all, is similar in some respects to a contract;
13         each party foregoes rights to use its land as it wishes in return for the
            assurance that the use of neighboring property will be similarly
14         restricted, the rationale being that such mutual restriction can enhance
            total community welfare. If the interest of these parties in preventing
15         unjustified variance awards for neighboring land is not sufficiently
            protected, the consequence will be subversion of  the critical reciprocity
16         upon which zoning regulation rests."

17       60. Wyatt's Finding #4 lists "house rules" for the Sycamore property but
18  fails to show their legal significance for the variance.

19       Wyatt's Finding #4 fails to address the City's not abiding the terms of
20  its "contract" with its stakeholders regarding prohibited uses if it grants one
21  a special privilege.  With the City having appropriated all but "one-eighth
22  value" of an owner's property-right, owners may demand their just-compensation
23  and thereafter take elsewhere Hollywood's economic base.

24       Wyatt's Finding #4 did not address the Record's allegations that the
25  Sycamore clientele or hangers-on caused severe injury to adjacent industrial
26  property.

27       Los Angeles has for some time a system of "Community policing", with a
28  Senior Lead Officer making contact with the public's issues. Wyatt's Finding is

1 absent any input or contact with the Senior Lead Officer for the subarea at
2 issue. Wyatt's Finding of "no injury", because one Police Unit recollected none
3 but merely reported one current facility survey, failed to report that ninety
4 percent of phone calls to police are "dropped" before answering.

5       Factual allegation #30, *supra*, listed three major "raids" which Wyatt's
6 Finding omitted. The City does not make "raids" without public outcry. People
7 stop complaining if no City corrective action follows.

8       New Restricted Industrial buildings may be injured like McQ's if a
9 commercial use draws the public into the midst of the zone that has little
10 police surveillance and interest.

11       61. The matter was sent to the City's Central Area Planning Commission
12 where private citizens selected by the Mayor act administratively on issues of
13 area-concern. Commissioners take the oath per Charter § 215 as follows:

      "I do solemnly swear (or affirm, as the case may be) that I will support
14       the Constitution of the United States and the Constitution of the State of
      California and the Charter of the City of Los Angeles, and that I will
15       faithfully discharge the duties of the office of Commissioner to the best
      of my ability."

16

17       62. Rules for the Area Planning Commission regarding variances are
different from rules per Title 28, United States Code. On a Form required by
18
City Code § 12.27 H, McQ set forth specifically the points at issue, the reasons
19
for the appeal, and the basis upon which McQ claimed there was an error or abuse
20
of discretion by DEFENDANT WYATT. The filing was timely and after postponement
21
was heard by four Commissioners.
22

      At such a hearing the person bringing the issue does not speak unless
23
called-upon. Zoning administrator is the principal speaker, ordinarily with
24
unlimited time. The person bringing the issue may be given from 3 to 10 minutes
25
to speak. The variance-requester may speak, rebut, or present *de novo* the
26
project plan and a "sales pitch". Audience members may be allowed one (1) minute
27
for comments. The person bringing the issue then may be allowed one to five
28

1 │ minutes for response to the other speakers. Afterward the property owner or its
2 │ "expediter" is allowed to make additional responses.

3 │     Usually a Councilmember's staffer may take an unlimited amount of time to
4 │ speak on the issue, presenting what the staffer wants the Commission to do.
5 │ Usually the Councilmember's staffer speaks after others' comments except for
6 │ Commissioners' are foreclosed.

7 │     63. Zoning Code 12.27 K requires the Commission to base its decision only
8 │ upon: (1) evidence introduced before the administrator, (2) the record, and (3)
9 │ arguments presented the Commission orally or in writing. The Code doesn't permit
10 │ new evidence at Commission-level.

11 │     A Commissioner may not reverse or modify the administrator's ruling except
12 │ by making written Findings setting forth specifically the manner in which the
13 │ administrator erred or abused discretion.

14 │     McQ has never witnessed a body of private citizens acting as Commissioners
15 │ disturbing administrators' findings unless the Councilmember's staffer opposes
16 │ the administrator's findings. Usually without debate or questions a Commissioner
17 │ Moves to Deny the request and accept the administrator's findings (or the
18 │ staffer's alternative) without explaining why. A Commissioner Seconds, and an
19 │ oral vote is unanimous. Minutes are the only supplement to the administrator's
20 │ report.

21 │     63. After the Commission's phase ended, McQ brought the issue to the City
22 │ Council as required by § 12.27 O. The matter was required to be filed in the
23 │ same manner and on the same form as for the Commission, except Commission's
24 │ errors or abuses of discretion are the subject. The matter was filed timely.

25 │     64. City Charter divides City powers. The Mayor is the Executive Branch per
26 │ § 230 and the Council is the Legislative Branch per §240 . The United States
27 │ Supreme Court in numerous cases including *Springer v Philippine Commission,* 277
28 │ U.S. 189 (S.Ct. 1928) declared that in the United States the Executive Branch

-12-

1  of a government may not have legislative power, and the Legislative Branch may
2  not have executive power. McQ testified on this issue to the Charter Commissions
3  and to the Council and Council Committees.

4      65. Zoning Code § 12.27 P1 permits Council to enact a variance resolution
5  by majority vote, but Council Rule sends the issue first to its Planning and
6  Land Management Committee (PLUM) for recommendation. Council approval or denial
7  usually accedes to PLUM recommendation but no public comment is usually allowed
8  after PLUM.

9      66. PLUM process for a variance used to be the same as for development
10  projects: The Planning Department began with an untimed presentation describing
11  the project and various issues and ideas. Next the developer presented (usually
12  untimed) a "sales pitch" with large project renderings. PLUM might ask questions
13  and get answers. Next the public's speaker cards would be counted and time
14  rationed to the public, usually one to two minutes each, including the person
15  bringing the matter to the Council. Speakers were cautioned not to repeat what
16  others said. Thereafter developer, Planning, and the area Councilmember's
17  staffer provided additional and often untimed comments.  The Chairperson then
18  would suggest an oral recommendation without explanation, and send to the
19  Council for affirmation.

20      67. Some variance disputants opposed PLUM's process because they were
21  allowed only one or two minutes of time although they brought the matter.
22  Sometimes DEFENDANT REYES relented and allowed the appellant more time, but
23  always Planning, the developer, and Council staffer spoke at length.

24      Although McQ attends many PLUM sessions, to his knowledge PLUM never
25  disapproved a variance except if a Councilmember's staffer so requested.

26      68. Plaintiff submitted substantial material on the subject case to PLUM
27  with specific facts, points and authorities regarding the Commission's errors,
28  including that the Commission's required reasoning was not issued. Also with the

1  statutory submissions McQ served PLUM Members with copies of the Supreme Court
2  reports germane to the issue, plus testimony at the United States Senate
3  regarding liability for Constitutional torts at issue.

4          69. California Government Code § 54952.2 prohibits presence at a standing-
5  committee session by a legislator who is not a regular member of the committee,
6  except as an observer. DEFENDANT WEITZER'S Councilmember is not a member of
7  PLUM.

8          70. The Commission made no appearance and was not questioned regarding
9  which facts, arguments, and reasoning produced the Commission's Report. Instead,
10 DEFENDANT WYATT was permitted to speak as if she were the Commission, first and
11 at length.  McQ got 10 minutes to discuss this case.

12         A well-known "zoning expediter" got to testify at length in support of the
13 variance after claiming not to represent the Sycamore business. DEFENDANT
14 WEITZER repeated her Commission testimony and asked PLUM to approve the variance
15 on "behalf" of her Councilmember-boss.  Her reasoning was declared legally-
16 invalid by *Broadway, Topanga,* and law.

17         71. DEFENDANT REYES refused McQ's request to speak in rebuttal.
18 DEFENDANT REYES ordered the matter reported as a denial of appeal. He said his
19 decision was the product of DEFENDANT WEITZER'S request.

20         72.  McQ served by FAX on Mayor, Councilmembers, City Attorney, City
21 Administrative Officer, Chief Legislative Analyst and Council Clerk a Statement
22 on "New and Unlawful Variance for Commercial Use in Zone Restricted to
23 Industrial Use", regarding City's risking not less than $11,858,062.00 but as
24 much as $6,580,574,000.00. The Statement by FAX 9 days before the issue was
25 addressed by Council prayed for remand for more work in Planning and for each
26 Councilmember to read the material in the File carefully.

27         73. On the Council agenda the matter passed per PLUM Report without
28 comment. McQ asked to speak but was denied. A bare quorum voted.  DEFENDANT

1  WEITZER'S Councilmember-boss, Tom LaBonge, remained absent until after the
2  matter was finished. The third Member of Plum, lawyer-Councilmember Jose Huizar,
3  was absent from PLUM hearing and Council meeting.

4      74. Regardless of Council action City Code § 12.27 P 2 enables the Mayor
5  to approve or disapprove the variance, based on the administrative record and
6  whether the Mayor believes the variance conforms with the requirements for
7  approval set forth. DEFENDANT MAYOR approved the variance.  The matter was ready
8  for publication March 22, 2011.

9      75. By reason of the foregoing facts, and the allegation that the facts are
10  not anomalous, City residents, workers, and taxpayers face substantial losses
11  if the above-described process continues.

12      76. By reason of the foregoing facts, Plaintiff remains substantially
13  injured.  Torts of $342,670.00 and Constitutional torts of $10,967,040.00
14  continue to mount. If the City continues its allegedly-unlawful reduction of
15  Restricted Industrial property, others like Plaintiff will have been defrauded
16  unless they receive just compensation for enduring their 87% loss of property
17  value. Alternatively the City could prohibit the unlawful use at 1037 Sycamore
18  and repair the City's allegedly-defective permitting-process. This Court may
19  establish a Monitor to assure process is corrected, similar to the Police
20  Department's repair.

21      77. Plaintiff desires a judicial determination of its rights and duties and
22  those of Defendants regarding the conditions set forth above.

23      78. Pursuant to 28 U.S.C. §§ 1443 and 2201, it is necessary, proper and
24  appropriate that this court have and assume jurisdiction of the aforesaid
25  contentions, claims, and controversies, to adjudge and decide the rights and
26  obligations of the parties hereto and to render declaratory and monetary
27  judgments.

28

1    WHEREFORE, Plaintiff prays:

2    1. That the Court declare that (a) an award of variance constituting a

3    special benefit to the Sycamore property not enjoyed by other properties

4    similarly-zoned in the same subarea violates the Equal Protection Clause of

5    United States Constitution Amendment XIV, and that (b) therefore no variance,

6    change of zone, or conditional use which will not apply equally to all

7    properties in the subarea may be permitted.

8    2. That the Court impose on the City duties to amend its practices

9    regarding variances, changes of zone, and conditional uses to assure all

10   properties in a zoning subarea are subjected to equal protection of law.

11   3. That the Court enforce the City's duty to administer zoning law so

12   that: (a) the moving party opens a quasi-judicial case, with reasonable time for

13   presentation, opposition has equal time, and moving party may rebut; (b) comment

14   is limited to parties, if others' comments aren't timely submitted in writing;

15   (c) finality is reasonably-quick; and (d) Councilmembers and staff do not

16   administer, participate in, nor influence specific cases.

17   4. That the Court grant preliminary and permanent injunctive relief

18   restraining Defendants from depriving Plaintiff and others from honest services.

19   5. That the Court grant suitable monetary relief from Plaintiff's injuries

20   received owing to Defendants' acts.

21   6. That the Court declare the respective rights of Plaintiff and Defendants

22   in accordance with the claims and contentions set forth in this complaint.

23   7. That Plaintiff recover its costs and fees herein incurred and obtain

24   such further relief as may be just and proper.

25   DATED: June 15, 2001.                    J. H. McQuiston, Plaintiff pro se

26

     J. H. McQuiston
27   6212 Yucca St
     Los Angeles, CA 90028-5223
28   Tel & FAX 323-464-6792



Map of Hollywood Manufacturing-zoning : Blue= Manufacturing Only; Red= Commercial-Residential;
Orange= Multiple Residential, Yellow= Single-family Residential; Green=Governmental
For Police-protection, a Manufacturing area must be compact and not have Pedestrian-traffic.

EXHIBIT "A"

-17-

1   McQuiston Associates                 **EXHIBIT "B"**
2   1035 North Orange Drive
    Los Angeles, California 90038
3   (213)   464-6792;    463-1040

4                       STATEMENT of J. H. Mc QUISTON
                        on ZONING CASE No. ZA 92-1196(ZV)

5   Mr Chairman and Members of the Board:

6        I am a professional  engineer licensed by the State of California to
7   practice engineering, and I am familiar with the Building and Planning Codes of
8   the City of Los Angeles. I own the manufacturing property shown on the "Zone
9   variance" plot map as parcel No.  16.

10        I participated in the revisions to the Hollywood General Plan/ Zoning
11   Consistency Program enacted by the City of Los Angeles, which revisions
12   included the subject matter as well  as my manufacturing property.

13        I also participate in the Redevelopment Plan for the part of Hollywood
14   which is being redeveloped by the CRA, and have from its time of enactment.

15        I believe it would be a serious and probably irreparable mistake to grant
16   a variance for the use described in this case.

17        Further,  the timing of this matter and the questions presented, plus the
18   information given to the property owners being inaccurate, places  in question
19   the veracity of the applicant.

20   1.   Certificate of Occupancy Problem

21        Unaddressed as an issue  (not listed as non-conforming) is the fact that,
22   according to neighbors, this business moved into the building and operated
23   therein for several  years prior to this hearing.

24        The Building Code specifies that:
       "Each change of occupancy to one classified in a different sub-group shall
25   require a new Certificate of Occupancy, whether or not any alterations to the
     building are required by this Code"
26       "Whenever any building * * * houses an occupancy other than that for which
     it was constructed, * * * the Superintendent of Building shall order, by
27   written notice,  that such violation be discontinued."

28                                       -18-

1    Therefore, because the original , and the prior tenant, was engaged in

2    operating a factory, and the Building Code requirement is different with respect

3    to the applicant business,  the applicant business  being unlawful acquired no

4    right of occupancy during this period. Accordingly, the notice of discontinuance

5    is the appropriate action in this matter.

6    2.    "MR1"  Restricted Industrial  Zone Problem

7    Also unaddressed as an issue  (not listed as non-conforming) is the fact

8    that businesses like the applicant's are prohibited under Sec.  12.17.5, LAMC.

9    The purpose of the zoning restriction,  per the Code, is:
     "To protect Industrial  land for industrial  use, and prohibit unrelated
10   commercial and other non-industrial  uses.
     "To upgrade industrial  development standards * * to protect industrial
11   investment against incompatible residential, commercial and industrial uses,
     and * * to prevent future industrial blight."

12

13   Specifically, any "commercial" usage is limited to that:
     " devoted primarily to the manufacturing of products, or assembling,
14   compounding,  processing or treating of materials and that any retail
     business conducted in connection with such use is only incidental to the
15   main use; or  * * Any such use is conducted only as an accessory use to the
     main use, and provides services for those persons employed on the
16   premises."

17   Therefore,  because the applicant cannot satisfy any part of the limited

18   commercial  usage listed by the Code, and never did, there should have been

19   included in the subject case the question of a nonconfonuing zoning as well as

20   the three nonconformances listed.

21   I believe that allowing such nonconforiming uses in this area will cause

22   severe problems because of its effect on the little area now remaining as a

23   manufacturing zone in Hollywood.   There is just not enough land available for

24   manufacturing use, and without sufficient land the possibility of obtaining and

25   maintaining manufacturers becomes improbable.   Without such in the mix of

26   occupations, the Hollywood area  will, in my expert opinion, be doomed.

27   We cannot let that dire consequence happen.  We must prohibit variances in

28   the "Restricted Manufacturing" zones in Hollywood.

1      We cannot afford to let the film and recording industries leave the area
2   because of invading commercial uses.  Such flight-prevention has been a policy
3   of both County and City for some time, and the zoning extant is a result of the
4   policy. To permit a variance directly contradicts that policy.

5   3.   Public Safety Problem

6      Also unaddressed as an issue (not listed as non-conforming) is the fact
7   that non-conforming activity in any zone restricted to industrial   usage
8   presents a serious  problem to the safety of industrial users. This area is no
9   exception.

10      It matters not that no police calls are logged against the nonconforming
11  business. Rather, the mere presence in the area of visitors during off-hours
12  acts to prevent police from recognizing unlawful actors in the area. Thus,
13  proper police surveillance is prohibited.  Crime can erupt.

14      In the past several years, my building has been attacked by miscreants,
15  as have adjacent owners'   buildings.  Serious evidences of crimes ( mutilated
16  bodies, raped children, shootings ) in the locality make it imperative that the
17  police be supported by keeping the visitors to non-industrial sites out of the
18  area.

19      The only way to accomplish this task is to deny non-industrial   uses;
20  that is, to deny this applicant, which I believe intends to bring visitors only
21  when the industrial  properties adjacent to the applicants are closed and the
22  sun is down.

23      There is plenty of space available at other sites in the Hollywood area,
24  especially in buildings properly zoned and already in areas where additional
25  police surveillance would not be required.

26  4.   500-foot Requirement Problem

27      The first of only three problems addressed in the public notice has to do
28  with the law requiring a minimum distance between a sexually-oriented commerce

-20-

1   and a residential zone.  This requirement backfires on any industrial  zone in

2   which such commerce would locate.

3        There is no question but what the City Council would have extended the

4   minimum distance if it believed such could have been upheld in court. But

5   experience with Pussycat Theatre, and others, has assured cities that courts

6   will  not tolerate de facto exclusion by the use of making suitable locations

7   impossible to find.

8        However, there are other such establishments in the Hollywood area. It is,

9   and has been, possible to locate in the area and still  satisfy the 500-foot

10  minimum.   What is not desirable, however, is to "open floodgates"

11  by breaching the 500-foot barrier.

12       But regardless of the Council's objective in restricting such locations,

13  to permit commerce deep inside a "Restricted Industrial" zone would degrade the

14  zone in or near its heart, considering the narrow area of such Hollywood zones.

15  Thus, while not generally helpful  for industry, the safest zone-busting by

16  commerce is on the outer boundary of the MR zoning.

17       Here,  the MR zoning is surrounded on all  sides, essentially, by

18  residential zoning.   Thus to position a commercial variance in the least

19  possible place to harm industry would, in the case of a sexually oriented club,

20  fly in the face of the Council's objective regarding residential separation. In

21  other words, no variance for such an applicant is possible if it includes

22  location  in this MR zone.

23       Perhaps to enhance its position, applicant's map purports to show other

24  commercial  activity within the 500 foot radius. Upon physically checking, the

25  map was  found to be incorrect. There is no commercial  activity as shown on

26  the map.

27       Specifically,  the  "Gay & Lesbian" building, which was formerly occupied

28  by the DuPont Co as a film warehouse for movie producers, is not occupied by

1   them and appears to be vacant. The "Book Store"   building,   parcel   28, is
2   owned and occupied by a manufacturer of electronics, and the owner's close
3   relative operates a small   portion of the building as a technical bookstore
4   which qualifies under the MR1 zoning and is extremely helpful to the various
5   technical   personnel   associated with film,   tape, and other production in the
6   zone.

7       Moreover,   the "parking" which is depicted on many lots is sometimes not
8   even available for such   (it contains structures used in business) or is
9   mandated minimum parking which was required by the various buildings in the area
10  as a condition of obtaining the various building permits.

11      In fact,   the entire parking on the applicant's lot is posted as parking
12  for another building in the area,   leaving no parking available to support the
13  statutory parking for the applicant's building.

14      Thus it appears that applicant cannot support a claim that there is only
15  485 feet from the residential   zone,   if the effect of the statutory parking is
16  considered, or that there is other commerce of a non-conforming nature which
17  might mitigate the Council `s rigid minimum distance.

18      For each reason and for the effect of the combination of reasons, no
19  variance should be given.

20  5.   Parking deficit Problem

21      The applicant-notice specifies that 36 parking spaces are required but not
22  available on-site, for this applicant.   The notice avers that 15, of which 14
23  are tandem, are available on-site.   A visual   inspection shows this not true.

24      Many buildings in the area have been altered in such manner as requiring
25  compliance with the Parking Code in order to obtain a Certificate of Occupancy:
            "No permit pertaining to the use of land or buildings shall be issued by
26          any department, officer, or employee of this City, vested with such duty,
            unless the application for the permit has been approved * * as to
27          conformance  of said use with the provisions of this chapter which includes
            the Parking  Code].  Any permit or certificate of occuoancy, issued in
28          conflict with the provisions of this chapter, shall  be null  and void."

-22-

1       "Whenever the automobile parking spaces which are required for a building by the provisions of this Article, are provided on a lot other than the one on which the building is located, the certificate of occupancy for said building shall be valid only while such parking spaces are being so maintained and shall bear a notation to that effect.   * * If at any time such automobile parking spaces are not being maintained, the certificate of occupancy shall automatically be cancelled and said building shall not thereafter be occupied or used until  the required automobile parking spaces are again provided and a new certificate is issued."

6    The area marked "pkg" in Parcel  31 of the map is constricted by structures
7 used in the operation of the ready-mix concrete plant and by the arrival and
8 departure of the concrete trucks.  The other parking is  wholly statutory, on
9 account of buildings constructed or modified on parcels 18, 19, 16, 21, 22, &
10 29. Moreover, the statutory parking is not sufficient to accommodate the
11 employee and visitor load at these,&~other parcels which presently are fully
12 built and without any parking at all.

13    Also, the owner of the parcel  27 has reduced the amount of parking there
14 by placing a large structure within it.   That parcel  is dedicated in entirety
15 to parcel 21 as a condition of occupancy.

16    Moreover, the owner of parcel  under application has apparently leased the
17 entire area on that parcel which is the parking lot, to the owner of parcel
18 29. I do not know if the owner has secured the required permits and collected
19 the mandatory taxes as required under the Parking Occupancy Tax Ordinance (Art.
20 1.15 of Chapter II, Sec.  21.15.1 et seq).  Thus in asserting that the area is
21 available for yet another lessee requires at least an explanation of how that
22 is possible.

23    If the parcel  is continued to be used as industrial  property, the
24 building size requires only 7 or 8 spaces. There being ample room, no pressure
25 on surrounding property would ensue. But if the parcel  is to require 36 spaces,
26 it would appear that there are no other spaces available in the neighborhood
27 which could be used to cover the shortfall.

28    Moreover, the lessee of parking on the applicant parcel apparently

1   converted part of the lessee's own parking to another use, thus relying on a

2   "lot other than the one on which the building is located". Presumably, then, the

3   owner of the applicant parcel, per the Code, recorded an agreement:

> "in the Office of the County Recorder * * as a covenant running with the
4     land * * providing that such owner or owners will continue to maintain
> said parking spaces so long as the building or use they are intended to
5     serve is maintained."

6       If so recorded, it requires an explanation from the owner to justify any

7   consideration of applicant's statement of availability of on-site parking. If

8   not so recorded, approval of applicant's petition would surely cause a domino

9   effect and may eject industry from the MR zone in favor of the noncompliant

10   commercial lessee.

11       It appears that under no circumstance would the parking code and the

12   practical parking situation in this area be resolved in favor of protecting the

13   industrial district if the variance is approved.

14       There is no option viable except to enforce the Code and to reject the

15   variance.

16   6.   Off-site Parking Problem

17       It appears that the total off-site parking requirement is not 21 as

18   stated by applicant but is instead the entire 36, due to prior commitment of

19   on-site spaces.

20       Nonetheless, even 21 spaces as alleged by applicant are not apparently

21   available, inasmuch as any available space on the block on either side is

22   reserved by statute for other buildings as a condition of their occupancy.

23       Presumably some space might be found at great distance from the parcel.

24   Such would result in large numbers of people strolling in the dark for long

25   distances and making it impossible for police to identify quickly those having

26   no real business in the area, at a time when the industries are unoccupied.

27       Moreover, automobiles parked on the street at night in the area have been

28   subjected to theft by outlaw towing, and have been stripped far away from the

1  point of theft. Thus street parking at night, when applicant apparently intends
2  to operate presently, is hazardous, and at day is overcrowded.

3      It does not appear likely that any recorded parking easement will be
4  forthcoming in favor of applicant on any local property, and it does not appear
5  likely that even if such could be forthcoming that the City would permit any of
6  the local parcels to relinquish any of their parking in favor of applicant
7  because the other parcel `s certificate of occupancy would be adversely
8  affected.

9      Thus it appears that applicant should be denied the variance if such
10 variance would require off-site parking to satisfy the minimum number of parking
11 spaces required by the Code.

12     And it appears that applicant should be required to maintain the Code
13 requirement for minimum parking spaces for the occupancy. Not having such, the
14 applicant should be denied the variance.

15 7.   Recorded Parking Dedication Problem

16     As hereinbefore stated, certain off-site parking requires a recorded
17 dedication by covenant running with the land. But also, the building on the
18 site exceeds the entire buildable area for the intended use by the applicant.

19
   Thus:
20     "as a prerequisite * * , the owner or owners of record of said lot shall
       record in the Office of the County Recorder * * a covenant running with the
21     land * * providing that so long as said building is maintained on said lot
       such owner or owners will  not erect any additional  buildings on the
22     unoccupied buildable area of the lot."

23     According to the applicant's request, the above mandatory requirement
24 should be waived by variance.   The problem is that applicant so far has not
25 complied with the law in so many respects that it is doubtful  that without
26 recording the covenant it would be observed.

27     One need only inspect the property to discover that the entire parking on
28 site is already dedicated to another off-site lessee. Perhaps the waiver is

1 | being sought because the Recorder would not accept two dedications regarding the
2 | identical  plot.

3 |     Applicant may intend presently to operate only when the other lessee is
4 | not operating.   However, nothing in the application would thus restrict the
5 | applicant or the other lessee.

6 |     The merit of the statutory requirement is demonstrated by analogy to
7 | markets and churches.   In days gone by, churches operated when markets were
8 | closed, and vice versa. Church architects were tempted to use market parking to
9 | solve church parking requirements, and could have except that markets would not
10 | agree to the covenant being recorded. If the variance to the requirement would
11 | have issued, then today when both operate simultaneously we would have parking
12 | chaos and severe economic problems.   The lesson is clear that the requirement
13 | for recording such off-site and on-site covenants should not be waived.

14 |     If applicant were contemplating an industrial use for this parcel , there
15 | would be ample room under the Code and recording would present no problem. The
16 | owner, like all others, should agree to such (provided the owner has not already
17 | complied with the Code and executed a prior covenant).

18 |     Therefore I believe it is in the best interests of the City and the local
19 | industry for applicant's request for waiver to be denied, and an executed
20 | covenant or covenants   (as necessary) be required as a prerequisite for the
21 | Certificate of Occupancy.

22 |     WHEREFORE, it is my request and expectation that the applicant's request for
23 | variances in this case be DENIED.

24 | DATED:   November 29, 1993                          Respectfully submitted,
25 |                                                                    /s/
                                                        J. H. McQuiston

26 |
27 |
28 |

**EXHIBIT   "C"**          1457 Pueo Street
Honolulu, Hawaii 96816
December 7, 1993

Mr. J. H. McQuiston
1035 North Orange Drive
Los Angeles, CA 90038

Dear Mr. McQuiston:
    Thank you for your letter of November 29 and the copy of your statement to the zoning Appeal Board.

    Mr. Sweet has a five year lease on 1037 North Sycamore with an option to renew for 5 years.   Since he has wanted this property for the past 10 years, the lease provides him with a "right of first refusal to purchase and a right of first offer to lease". The Lessor's consent is not required in dealing with a subtenant. Consequently, I have not been provided with a copy of Mr. Sweet's lease with the subtenant.

    Mr. Sweet and his staff went to great pains to assure me that they would upgrade the property in such a way that I would be "proud to pass it on to my daughter when the time comes ".  This has not proven to be true, and my position has been to object to the business of the subtenant in whatever manner I can.
            (1)  At the time the subtenant wanted to apply for a
                 variance, my signature as the owner was required.
                 I refused to sign such an application. We were hopeful
                 this would end. the matter, but it did not.

            (2)  Through Mr. Sweet the subtenant offered me an
                 additional sum of money each month for "my favorite
                 charity", or to keep for myself,  This I refused in
                 writing, even though Mr. Sweet sent a "test"check which
                 I returned. When the same amount was added to my rent
                 the following month, I told Mr. Sweet I would apply
                 it exclusively to future rent.  Subsequently, he
                 subtracted the amount in question from the next month's
                 rent.  This action ended the scenario.

            (3)  My third opportunity to express opposition was with
                 the letter I submitted to the hearing.

    I will be in Los Angeles from December 11 – 18 and expect to discuss these matters with my attorney, who has copies of the materials you sent me.
                              Sincerely,
                              /s/

                         Margaret M. Camp

1          **EXHIBIT "D"**

2  California Code of Civil Procedure Excerpt

3  **1094.5.**   (a) Where the writ is issued for the purpose of inquiring into the
validity of any final administrative order or decision made as the result of a
4  proceeding in which by law a hearing is required to be given, evidence is
required to be taken, and discretion in the determination of facts is vested in
5  the inferior tribunal, corporation, board, or officer, the case shall be heard
by the court sitting without a jury. All or part of the record of the
6  proceedings before the inferior tribunal, corporation, board, or officer may be
filed with the petition, may be filed with respondent's points and authorities,
7  or may be ordered to be filed by the court. Except when otherwise prescribed by
statute, the cost of preparing the record shall be borne by the petitioner.
8  Where the petitioner has proceeded pursuant to Section 68511.3 of the Government
Code and the Rules of Court implementing that section and where the transcript
9  is necessary to a proper review of the administrative proceedings, the cost of
preparing the transcript shall be borne by the respondent. Where the party
10  seeking the writ has proceeded pursuant to Section 1088.5, the administrative
record shall be filed as expeditiously as possible, and may be filed with the
11  petition, or by the respondent after payment of the costs by the petitioner,
where required, or as otherwise directed by the court. If the expense of
12  preparing all or any part of the record has been borne by the prevailing party,
the expense shall be taxable as costs.

13

        (b) The inquiry in such a case shall extend to the questions whether the
14  respondent has proceeded without, or in excess of jurisdiction; whether there
was a fair trial; and whether there was any prejudicial abuse of discretion.
15  Abuse of discretion is established if the respondent has not proceeded in the
manner required by law, the order or decision is not supported by the findings,
16  or the findings are not supported by the evidence.

17        (c) Where it is claimed that the findings are not supported by the evidence,
in cases in which the court is authorized by law to exercise its independent
18  judgment on the evidence, abuse of discretion is established if the court
determines that the findings are not supported by the weight of the evidence.
19  In all other cases, abuse of discretion is established if the court determines
that the findings are not supported by substantial evidence in the light of the
20  whole record.

21        (d) Notwithstanding subdivision (c), in cases arising from private hospital
boards or boards of directors of districts organized pursuant to The Local
22  Hospital District Law, Division 23 (commencing with Section 32000) of the Health
and Safety Code or governing bodies of municipal hospitals formed pursuant to
23  Article 7 (commencing with Section 37600) or Article 8 (commencing with Section
37650) of Chapter 5 of Division 3 of Title 4 of the Government Code, abuse of
24  discretion is established if the court determines that the findings are not
supported by substantial evidence in the light of the whole record. However, in
25  all cases in which the petition alleges discriminatory actions prohibited by
Section 1316 of the Health and Safety Code, and the plaintiff makes a
26  preliminary showing of substantial evidence in support of that allegation, the
court shall exercise its independent judgment on the evidence and abuse of
27  discretion shall be established if the court determines that the findings are
not supported by the weight of the evidence.

28

1     **(e)** Where the court finds that there is relevant evidence that, in the
2  exercise of reasonable diligence, could not have been produced or that was
improperly excluded at the hearing before respondent, it may enter judgment as
provided in subdivision (f) remanding the case to be reconsidered in the light
3  of that evidence; or, in cases in which the court is authorized by law to
exercise its independent judgment on the evidence, the court may admit the
4  evidence at the hearing on the writ without remanding the case.

5     **(f)** The court shall enter judgment either commanding respondent to set aside
the order or decision, or denying the writ. Where the judgment commands that the
6  order or decision be set aside, it may order the reconsideration of the case in
the light of the court's opinion and judgment and may order respondent to take
7  such further action as is specially enjoined upon it by law, but the judgment
shall not limit or control in any way the discretion legally vested in the
8  respondent.

9     **(g)** Except as provided in subdivision (h), the court in which proceedings
under this section are instituted may stay the operation of the administrative
10  order or decision pending the judgment of the court, or until the filing of a
notice of appeal from the judgment or until the expiration of the time for
11  filing the notice, whichever occurs first. However, no such stay shall be
imposed or continued if the court is satisfied that it is against the public
12  interest. The application for the stay shall be accompanied by proof of service
of a copy of the application on the respondent. Service shall be made in the
13  manner provided by Title 5 (commencing with Section 405) of Part 2 or Chapter

14  5 (commencing with Section 1010) of Title 14 of Part 2. If an appeal is taken
from a denial of the writ, the order or decision of the agency shall not be
15  stayed except upon the order of the court to which the appeal is taken. However,
in cases where a stay is in effect at the time of filing the notice of appeal,
16  the stay shall be continued by operation of law for a period of 20 days from the
filing of the notice. If an appeal is taken from the granting of the writ, the
17  order or decision of the agency is stayed pending the determination of the
appeal unless the court to which the appeal is taken shall otherwise order.
18  Where any final administrative order or decision is the subject of proceedings
under this section, if the petition shall have been filed while the penalty
19  imposed is in full force and effect, the determination shall not be considered
to have become moot in cases where the penalty imposed by the administrative
20  agency has been completed or complied with during the pendency of the
proceedings.

21

22     **(h) (1)** The court in which proceedings under this section are instituted may
stay the operation of the administrative order or decision of any licensed
hospital or any state agency made after a hearing required by statute to be
23  conducted under the Administrative Procedure Act, as set forth in Chapter 5
(commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the
24  Government Code, conducted by the agency itself or an administrative law judge
on the staff of the Office of Administrative Hearings pending the judgment of
25  the court, or until the filing of a notice of appeal from the judgment or until
the expiration of the time for filing the notice, whichever occurs first.
26  However, the stay shall not be imposed or continued unless the court is
satisfied that the public interest will not suffer and that the licensed
27  hospital or agency is unlikely to prevail ultimately on the merits. The
application for the stay shall be accompanied by proof of service of a copy of
28  the application on the respondent. Service shall be made in the manner provided

by Title 5 (commencing with Section 405) of Part 2 of Chapter 30 (commencing with Section 1010) of Title 14 of Part 2.

(2) The standard set forth in this subdivision for obtaining a stay shall apply to any administrative order or decision of an agency that issues licenses pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code or pursuant to the Osteopathic Initiative Act or the Chiropractic Initiative Act. With respect to orders or decisions of other state agencies, the standard in this subdivision shall apply only when the agency has adopted the proposed decision of the administrative law judge in its entirety or has adopted the proposed decision but reduced the proposed penalty pursuant to subdivision (b) of Section 11517 of the Government Code; otherwise the standard in subdivision (g) shall apply.

(3) If an appeal is taken from a denial of the writ, the order or decision of the hospital or agency shall not be stayed except upon the order of the court to which the appeal is taken. However, in cases where a stay is in effect at the time of filing the notice of appeal, the stay shall be continued by operation of law for a period of 20 days from the filing of the notice. If an appeal is taken from the granting of the writ, the order or decision of the hospital or agency is stayed pending the determination of the appeal unless the court to which the appeal is taken shall otherwise order. Where any final administrative order or decision is the subject of proceedings under this section, if the petition shall have been filed while the penalty imposed is in full force and effect, the determination shall not be considered to have become moot in cases where the penalty imposed by the administrative agency has been completed or complied with during the pendency of the proceedings.

(i) Any administrative record received for filing by the clerk of the court may be disposed of as provided in Sections 1952, 1952.2, and 1952.3.

(j) Effective January 1, 1996, this subdivision shall apply to state employees in State Bargaining Unit 5. For purposes of this section, the court is not authorized to review any disciplinary decisions reached pursuant to Section 19576.1 of the Government Code.